The next case on our docket is United States of America v. Sean Rockwell. That has been submitted on the briefs. As the next case as well, Alan Horatska v. Earl Hauser has also been submitted on the briefs. The next case is Rebecca Leeper v. City of Tacoma. Counsel, please come forward. Good morning, Your Honor. Lauren Cochran for Rebecca Leeper. May it please the court, may I also reserve five minutes for rebuttal argument and for any questions that the court may have for Mr. Thompson's counsel, who is appearing today but is not arguing. On July 17th of 2018, PPD officer Tell Thompson was in the loss prevention office at a local Tacoma supermarket, Fred Meyer. He was only in that office because he was a fully uniformed Tacoma Police Department officer and he was working both extra duty and importantly he was working on duty as a police officer to provide high visibility patrol and to provide security services. As a TPD officer, his high visibility control included having his TPD cruiser parked at or near the entrance of the store. He walked through the store in full uniform carrying his service pistol, his handcuffs, wearing his badge and his less than lethal equipment as well. Everything that he also wore when he was a TPD officer on regular patrol. In addition to the high visibility patrol that Mr. Thompson provided, he was also there for loss prevention and for security purposes. On July 17th of 2018, while officer Thompson was in that loss prevention office, he sprung from behind a door and he from behind grabbed onto Rebecca Leeper's breasts, he jiggled them about, he made profane comments about their size and he laughed while others stood on with their mouths agape at what was going on. As a result of this, I think we're familiar with the fact that I am conscious of your time. If I can ask you a question, if we determine that Mr. Thompson was on duty during this assault that you described, what's the proper test or factor that this court should consider to determine if Mr. Thompson was acting under color of law? Do we apply the three-factor test established in Anderson? We do, Your Honor, but it's not a perfect test. The idea is to look generally, again you're looking at the totality of circumstances to see whether or not it was reasonable for one to look at that state actor and understand that he is or she is acting under color of state law. The things that we look at through the case law is, is the individual actually in uniform? Are they reasonably understood to be acting as law enforcement? And then what were they actually there for? The undisputed testimony is that officer Thompson and anyone else who worked for these supermarkets who was a TPD officer was on duty as an officer first and foremost. So how did the officer, let me, just as you go through that, how did the officer know that she was going to enter into the, into the eating room or wherever it was, the office? Judge Pius, do you mean how did Rebecca Leeper know or how did officer Thompson? How did officer Thompson know? Well, I think he had. Why, why did he go in there and, and get behind the door? Did he know that she was coming? That's my understanding. Yes, she was doing. How did he, how did he know? Did he, did he call her to come over? No, she was doing a random audit of the store. How did he, how did he, do we know how she, how the, how officer Thompson knew that she was going to be there? That is how he got, he, for some reason or other, he knew that she was, he must have known that she was coming because he got behind the door, waited for her to enter, and then he stepped out and groped her. And I don't know. How do you know that was the moment he should get behind the door? Well, I don't know that we, we have a clear answer to that other than the fact that he was at the store already. He was working there and Rebecca as a part of loss prevention was doing an accounting of each one of the stores. This is one of the stores that she was at. And it's my understanding that officer Thompson learned that she was there and then wanted to play some sort of a joke on her. And so he hid behind the door and then popped out. And that's the point where he interfaces with her, gropes her and sexually assaults her in front of others. Let me ask you, I'm sorry for interrupting. Let me ask you this question. It appears that, that your argument really collapses the first and second factors of those three, three factor tests that is that he's acting in the performance of official duties. And then he also invoked his status as a law enforcement officer to influence the behavior of others. Am I understanding correct that you're essentially saying under the facts of case, once you establish the first factor, you have established the second factor or are there additional facts that we need to look at to determine that second question of invoking his law enforcement status? Well, I don't think that you can specifically look at each one of the cases that address this issue and say, okay, the individual actually has to say, I'm a police is a case where a, an officer who was not on duty, not in a patrol car, not in a uniform jumps out, starts beating the other driver that rear ends and yells, I'm a cop. Everybody stand back. I don't think it can be that black and white. There has to be other circumstances such as here's an officer that's fully in uniform. He's only in a spot where he would be as a TPD officer. And the others, the reaction of the others is similar to Warner in that they're not doing anything. No one is saying as they may with a private actor or even another employee of Fred Meyer, they're not saying, Hey, stop that. That's not appropriate. They can't do anything about it. So that's my question. You're saying that because he was on duty for all intents and purposes in uniform power of arrest and all of that stuff implicitly, that means he invoked his authority as a police officer for purposes of this case, that second element essentially satisfied. Once you establish he's effectively on duty, is that your position? Yeah, that's exactly right. And my misunderstanding in your first question, yes, they do collapse. Then the difference again in Warner is that man is not in uniform. He's not driving a police car. There's nothing that would indicate that he's an officer other than his own words. So that's why Anderson is parsed out the way that it is. But here you've got somebody who is clearly a TPD officer. Everybody knows that first and foremost, he's there to protect and serve the city of Tacoma. There are a couple of cases out of circuit that have held when an officer is on duty and harm someone the officer has a relationship with. And in this case, these two had a friendship, correct? Mr. Lee, Miss Lieber and Mr. Thompson. Yes. Yeah, I think that is true. So this these cases say when someone's on duty and harvest someone, the officer has a relationship with because I think they had joked in the past. In your case, the officer is acting out of motivation of that relationship and not under the color of state law, even though the officer was on duty at the police station and in uniform. So why shouldn't we adopt the same reasoning here given the history of Mr. Thompson and Miss Lieber and their their past friendship? Sure. And Judge McGee, I think the big difference is that the cases that you're talking about deal with a relationship that's completely and wholly outside of what the act is that has actually been a constitutional violation. And so we're looking at a case out of DeKalb County, Georgia, in the 11th Circuit, where there is a rate, but it comes after depending on I was referring to the first circuit case of Martinez versus Cologne and the circuit in Del Cambre versus Del Cambre. But go ahead. Tell me why why we shouldn't look at those. Well, because they're not necessarily the nexus is not so close in time to what the actual constitutional violation is. And just to the point of a prior relationship, I don't think that that's dispositive in any way that this that Rebecca Lieber may have engaged in what would be known as locker room talk if she was a and that therefore that locker room talk can proceed to an actual sexual assault. We would never allow that between two men. If a man came in after locker room talk, be it via text or whatever else, and then another man grabbed his genitals, that would not be OK. And it can't be OK for the city of Tacoma to say, well, you know, they had a close relationship. They exchanged sometimes questionable texts and patted each other on the buns from time to time. So it's OK to tell Thompson as a fully uniformed police officer went and sexually groped her after the fact. You rely on you rely on Fontana and Anderson for support. But the officers there and I can't tell if that was one of the cases you were referring to right now were engaged in behavior related to their official duties. I think it was in Fontana. The officer had arrested the plaintiff and in Anderson, the officer was using his role as an officer to intimidate the plaintiff even though he was off duty. Here, it seems like Mr. Thompson was not performing his official security duties, although this gets complicated because he's cloaked with all of his official duties in light of the contract that the police department had with the Fred Meyer store. But he really was was he really performing his official duties when he groped Miss Leeper? No, he wasn't, Your Honor, but that's not actually the test. And Anderson being Warner and Thompson specifically say, well, we can't look at it in the same light. We cannot conflate in the course and scope of duty with acting under the color of law. So in Fontana v. Haskin, for instance, the officer is not acting within the scope and duty of his employment when he sexually harasses and gropes the DUI suspect. Nobody contends that he was. But what he's doing is he's using that official position that, again, tell Thompson had the exact same position because first and foremost, he was a TPD officer effectuating arrests when applicable. He's doing the same thing as the officer in Fontana v. Haskin. He's going outside the scope of employment, arguably, but still acting under the color of law. What happened? Let me ask you. I just have one last question for you. What happened in the room after the groping? Well, I think the record shows that everyone was just kind of stunned, didn't know exactly how to specifically react. It took Rebecca Lieber some time to process what had just happened. She wasn't expecting to see Officer Thompson. And so it was shortly after that that she did report it. She reported it to her supervisor who then did he say anything? Did he say anything affirmative in response to what happened in the room where other people had watched what had taken place? Affirmative as being what, Judge Pius? Anything. What did he say? Well, he said... Did he laugh? Did he say, oh, this is just fun? Or did he say, you know, ha ha ha? He said, look at these tits. They're huge. And then he grabbed the back of her bra straps and he pulled them back and forth as if he was a marionette. And what did the other folks in the room say or do? Well, the record shows they basically sat there agape and not knowing what to say. Here you've got a fully uniformed police officer who's doing that, and they don't have control over him. TPD and its supervisors are the only ones that have control over Tell Thompson. And again, he's fully uniformed. He has his position there. And so no one's, I mean, understandably, no one's going to come up and say, hey, you can't do that. Get out of here. Okay. In addition, Ms. Leeper has brought a Monell claim based on... You have one minute left in your time. So I'll give you a few more minutes, but thank you. No, I appreciate it, Your Honor. And I can make it brief. She is also playing a Monell violation. No, no, no. For rebuttal, you only have one minute left, but I'll give you a couple of minutes, okay? Oh, very well. So let's go on to Ms. Yotter. Thank you, Your Honor. Please state your appearance. Good morning. Michelle Yotter, Deputy City Attorney on behalf of the City of Tacoma today. I'd like to begin by correcting a couple of things council said. First, the City of Tacoma in no way says it's okay that Mr. Thompson touched Ms. Leeper's breast. In fact, the City of Tacoma fired Mr. Thompson for that very conduct. The city's position is that there was no constitutional deprivation because Mr. Thompson was not acting under the color of law when he touched Ms. Leeper's breasts. And briefly, I would like to point out to the court that the city does believe the conduct was tortious, and Ms. Leeper, a remedy for that tortious conduct remains. Two claims remain against Mr. Thompson, a claim of assault and battery, and a claim of intentional infliction of emotional distress. So Ms. Leeper is not a remedy against the city. And turning back to the color of law argument, this case is not about what Mr. Thompson was wearing. This case is not about what equipment he donned. It is not about the vehicle he drove to Fred Meyer that day. Council's argument in terms of the 9th Circuit... Ms. Yotter, if we determine that Mr. Thompson was on duty during the assault, which I think you say he was not on duty during the assault? He was not on duty during the assault, and I can explain how that works if the court would like. Why don't you do that? Because it looks like from the record that he was on duty in light of the contract that was in place between the city and... And I mean just literally on duty. Was he not working as security for Fred Meyer and that there was an arrangement between the city of Tacoma Police Department and Fred Meyer? If you could address that, please. Yes. And that gets a little bit confusing. Mr. Thompson was working in what we classify an off-duty position. That means he does have the ability, he has to apply to the Tacoma Police Department and get permission to do so. He's working as private security for Fred Meyer in this case. Fred Meyer was paying Mr. Thompson an hourly wage to do so. Under the contract between the city and the store, if Mr. Thompson, for example, was to make an arrest to assert police power, he then goes into an on-duty status. The city of Tacoma begins paying his wage, he can make an arrest, and he can transport that prisoner or that suspect to jail. The city would pay for all of that, and he would then be considered on duty. But when he is just simply at a retail establishment, not working for or on behalf of the city of Tacoma, just carrying out private security functions, he is not technically on duty. But that really isn't the critical question here, and I would direct this... Just let me interrupt you right there. Why was he allowed to wear his uniform if that's the case? So that is part of the... And carry his weapon and his other accoutrements that are necessary to a police officer. Use his vehicle. Yes, for two reasons. First of all, officers who are working in an off-duty capacity must be available at all times. So if there was an... When they go into an off-duty status, he has to alert our... We call it South Sound 911, our dispatch system, that he is in an off-duty capacity. So if there's an emergency anywhere in the city, they can contact him and say, stop your off-duty account and report here. So he can be dispatched when he's in an off-duty capacity. Second, it's so that if he leaves that off-duty capacity, for example, he effectuates an arrest of a shoplifter while at Fred Meyer, he does. He's now exerting police power. He is now in an on-duty status and he's ready to go. Well, he's still walking around the store looking like a typical Tacoma police officer, right? A reasonable customer would think this is a cop. That is absolutely true. And the police presence is one of the reasons the store engages police officers in an off-duty capacity. The city doesn't dispute that. But importantly, the Seventh Circuit case of Gibson v. Chicago identified that acts committed by officers, even while on duty and in uniform, are not under the color of law unless they are in some way related to the performance of police duties. And this circuit adopted that very language in Van Orde. The question here isn't whether he was in a police uniform or even whether or not he was on duty. We know from the three- Can I ask you, was he authorized to use his police powers during his shift? Yes or no? Yes. If conduct occurred that required him to invoke the powers of a police officer, he did have that authority. So viewing the evidence in the light most favorable to Ms. Leeper, doesn't it appear that Mr. Thompson was on duty even though this shift was entitled to off-duty? If you could try to answer that, I'd appreciate it. Certainly. And I think it goes first back to that language that we see in Van Orde that originated from Gibson v. Chicago. It's not whether or not they're off-duty. And PN Jew Park v. City of Honolulu takes that one step further. They articulate a very clear three-part test to determine whether or not an officer is on duty. And so, I think the question is, is the character of the actions? Ms. Leeper must come forward with some evidence to establish that at the time Mr. Thompson touched her breast, he was invoking his status as a law enforcement officer with the purpose and effect influencing her behavior and that he engaged in conduct that was related in some meaningful way to his governmental status for the performance of his duties. And he wasn't doing so. Mr. Thompson was located in the back room socializing with other employees. He saw Ms. Leeper on a security monitor that would be approaching the back room. He hid behind a door to joke with her. When she came into the room, he sprung out from behind the door. Counsel left out a couple of important facts. First, he hugged Ms. Leeper. They shared a mutual hug. Then he gave Ms. Leeper a pelvic thrust, which was part and course for their normal relationship. Then she alleges he touched her breast and Mr. Thompson acknowledges that he touched her breast. This was not done as his status as a police officer. He was acting as a private citizen when he was joking around with Ms. Leeper. That was characteristic of their long-standing relationship. He didn't say, and I would distinguish the case that counsel cites Fontana v. Hoskins in that there was an on-duty officer who also fondled a plaintiff. But in that case, the plaintiff was in handcuffs in the back of a cruiser. If Mr. Thompson had handcuffed Ms. Leeper and told her she wasn't free to leave and then fondled her, that would be a different story. It's the very character of the conduct that leads up to the tortious conduct. And so I think the court's already mentioned a lot of other out-of-circuit cases this morning, and one that I do think is very important is out of the Fifth Circuit, and that's Townsend v. Moya. Because even though the Ninth Circuit hasn't had a case with facts specific that we have here, this case is very close. In Townsend v. Moya, a prison guard was on duty, located in the prison in full uniform. He had developed a personal relationship with a prisoner. The two of them were joking. They had a horseplay type relationship. While they were engaged in horseplay, the prison guard pulled out a knife in a joking manner and accidentally cut the prisoner. And the court in that case found that even though he was inside the prison, on duty, guarding prisoners in full uniform, he was acting as a private citizen because he was engaged in private horseplay. And that is precisely what we have here. Mr. Thompson and Ms. Lieber had a very long history of private horseplay. But does it matter here, though, that prior to this incident, they were, she, Ms. Lieber, had cut off sort of the friendship, had said she didn't want to be assigned to the same store as him, and he was reassigned. Does that factor in at all to our analysis? I don't believe that factors into the analysis at all. When looking at whether or not Mr. Thompson was acting under the color of law, the facts at the time of the touching, the circumstances, just the moments to and up to the touching, are the critical factors. Whether or not, and for the record, Ms. Lieber admittedly never told Mr. Thompson that she didn't want to have contact or that there was a change in the relationship. Ms. Lieber only contacted TPD and asked that he work at a different store. She never communicated that to Mr. Thompson, and he had no knowledge of that. But the essential inquiry is whether the actions, the very actions, the fondling of her breasts, was in any way related to the performance of his police duties, and there can be no argument to the contrary. Mr. Thompson... Mr. Chair, I just want to, I want to just clarify, make sure I understand the scenario, how it unfolded. You said that, that Officer Thompson saw her on a video screen. I believe that is what, that is in the record. Is that, is that how he knew she was headed to the, to the room? That's my understanding. He was socializing with another risk manager in the back room. They were just back there joking around already, and he saw her coming on the monitor and wanted to surprise her. He thought their relationship was in good standing. Okay, so he hides behind the door. He hides behind the door. He jumps out. They hug. Wait a minute, she enters. She enters. And he just steps around from the door. Jump, I believe, jumps out. Jumps out, and what does he then do? He hugs her. They mutually embrace. He gives her... She hugs him back? She does. And then what happens? He gives her a pelvic thrust, which is characteristic. This was a normal type of interaction for the two of them. Ms. Leeper, I believe in her deposition, which is in the record, testified that about 25% of the time the two embraced, he would follow the embrace with a pelvic thrust, and that touches her breasts. They laughed. Then he pulls out his phone and shows her a sexually explicit photo, I believe is her testimony. Everybody in the room... And again, I do want to correct. Mr. Cochran stated that there's evidence that everybody was a gape. I'm not aware of any evidence in this record wherein anybody testified they were in a gape over the situation. I believe the... He shows her the video, I mean, the cell phone. He shows her the cell phone. And then what happens? They're laughing. And then she leaves and goes out on the floor and conducts an audit, works her full shift. Doesn't he pull on her straps? When does he do that? So, yes. So that's part of the breast touching. I didn't break that down. I believe there's... Ms. Leeper's testimony is that he cupped the breasts, jiggled them, and then pulled on the straps, all kind of in one swoop. That's before the showing of the photo. And then after the incident, she leaves or they continue to talk? I believe she leaves fairly quickly after the incident, goes out onto the retail floor, and conducts a full audit. And what does he do? He continues his duties in an off... His role in an off-duty capacity there. I believe he stays in the back room for at least some period of time talking with the other risk manager and continues about his day. Okay. All right. Thank you. I wanted to ask you about the negligent retention and supervision claim. Yes. Because it appears that you rely on Betty Wye versus Al Howlow for support. But there, the court made much of the fact that the rape did not occur on work premises. Here, on the other hand, as we've just been I'm trying to figure out, how does that case help you? Yeah. It's not just the premise that he was on. The conduct in and of itself has to be facilitated by the employer. And here, Mr. Thompson's conduct wasn't related or made possible by the employment. It wasn't Thompson's status as a police officer. Again, he wasn't taking her into custody. She wasn't in the back of a patrol car. That wasn't what facilitated the fondling. What facilitated the fondling was the personal and sexually charged relationship that the two had developed over the years. Okay. And the investigation that the Tacoma Police Department conducted after this assault of Ms. Leeper revealed a number of instances in which Mr. Thompson was inappropriate. Apparently, the TPD was aware that he had made female employees uncomfortable at Fred Meyer and had previously sent an unsolicited naked picture of himself to an animal control officer prior to this incident. Is this, I guess, I want to give you an opportunity to respond to this. Is this evidence alone not enough to indicate that a jury could conclude that the TPD knew or should have known about Mr. Thompson and that perhaps he might have been unfit? So the only evidence in the record is that Ms. Leeper maybe told TPD that he creeped out a female employee, no other information, and she indicated that moving him to another store was an adequate remedy. That's the only thing TPD possibly knew before Ms. Leeper's complaint. With regard to the photo sent to the animal control officer, that had actually happened years before, but TPD did not learn about that until Mr. Thompson was already out on administrative leave being investigated for the incident with Ms. Leeper. And importantly, I thought a sergeant knew about that at the time because a sergeant went to the animal control officer who said she didn't want to file a complaint. Am I wrong on that? Yes. First of all, it was a captain. It was Captain Stringer. This can be found at ER 54 through 58, Captain Stringer's deposition. While Mr. Thompson was out on administrative leave, this is made clear in that deposition, Captain Stringer became aware through the rumor mail that at some point prior to Officer Madden even working for the Tacoma Police Department, she had received a single unsolicited picture from Mr. Thompson. Captain Stringer met with Officer Madden. Officer Madden told Captain Stringer it happened outside of work. Officer Madden, who wasn't an officer at the time, enjoyed also a friendship outside of work unrelated to her employment with Mr. Thompson. The two socialized. They went to dinners together. They were in the same friend circle, I believe is how she described it. Help me clarify the timing on this again. I'm sorry. So the captain became aware of this when? In 2018. While Mr. Thompson was out on administrative leave being investigated related to the comments of Lieber. But the photo exchange had happened years before actually. And nobody knew about it. And even when TPD did find out, Officer Madden was very clear. It happened because of their friendship. It was, her testimony is, it was in no way related to my employment. It was done from our personal phones off of work time and also through a other questions. Okay. Thank you very much. Thank you. Mr. Cochran, I'll give you a couple, yeah, I'll give you three minutes. I appreciate your honor and I'll leave time for the panel to ask Mr. Thompson's counsel any questions if there are any. There are a lot of factual differences and understandings within the record. Rebecca Lieber does not agree at all with the way the city of Tacoma is specifically representing these facts. Number one, there was no hug and pelvic thrust before Bill Thompson grabbed Rebecca Lieber from behind. That just didn't happen. And the idea that no one had any idea until he was out on administrative leave that tell Thompson had a history of inappropriate sexually charged conduct, again is a factual issue that the jury should be able to weigh. Decide credibility and then decide one way or another whether there's liability. The burden was flipped, unfortunately, at the district court and the city of Tacoma offers what it calls is a better version of the facts. And they've done so again today. And though the ultimate finding is predicated on those facts, this is a de novo review of summary judgment. And in the de novo review, the facts of the non-moving party are supposed to be presumed to be correct. That is not the way this particular case was decided. And there are significant factual differences in what the city of Tacoma is saying versus what Ms. Lieber's record shows. I want to address just very quickly the idea that an officer has to assert some sort of police powers in order to be acting under color of law. What would that do for an officer that says nothing? The city of Tacoma wants, again, to conflate this within the scope and course of employment versus under color of law. And those are two different ideas. The idea isn't that necessarily an officer has to say, okay, you're under arrest or I'm a police officer. Now I'm asserting that and therefore now I'm acting under a color of law. That wouldn't make sense for any of the cases that are out there and it would flip the burden of what a reasonable person would look at when they're specifically looking at is this person acting under color of law. The Ninth Circuit cases do not support the idea that there has to be an assertion, there has to be an official act in order for an officer to be working under color of law. And with my time winding down, I would just ask this court to look at the de novo review, recognize that there are significant differences in the narrative of each plaintiff and the defendant, and allow a jury to be the proper arbiter as to the credibility of those facts. Thank you. Thank you, Mr. Cochran and Ms. Yotter. Appreciate your oral arguments here today. The case of Rebecca Leeper versus the city of Tacoma is now submitted.
judges: MURGUIA, PAEZ, NGUYEN